UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | Criminal Action No. 5: 21-136-DCR |
| ) | |
| V. ) | |
| ) | |
| RUDY GUERRERO, ) | **MEMORANDUM OPINION** |
| ) | **AND ORDER** |
| Defendant. ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Following a three-day jury trial, Defendant Rudy Guerrero was convicted of one count of conspiring to launder money in violation of 18 U.S.C. § 1956(h). At the close of the government's evidence and again after the close of the defendant's case, the Court declined to grant the defendant's motion for a judgment of acquittal. Thereafter, Guerrero filed motions for a judgment of acquittal and for a new trial. Because substantial evidence supports the jury's verdict and the interests of justice do not warrant a new trial, his motions will be denied.

**I.    The defendant is not entitled to a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure.**

A Rule 29 motion challenges the sufficiency of the evidence. *See* Fed. R. Crim. P. 29(a). In reviewing the defendant's motion, the Court "must decide whether, after viewing the evidence in a light most favorable to the government, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Hendricks*, 950 F.3d 348, 352 (6th Cir. 2020). The Court does not weigh the evidence, consider witness credibility, or substitute its judgment for that of the jury. *Hendricks*, F.3d at 352 (citing *United States v. Wright*, 16 F.3d 1429, 1440 (6th Cir.

1994)).  A defendant seeking a judgment of acquittal notwithstanding the jury's guilty verdict bears "a very heavy burden."  *Id.*

The sole count of the indictment alleged that, beginning in or about August 2018 and continuing through on or about December 9, 2021, in Fayette County, in the Eastern District of Kentucky, and elsewhere, [Defendant One], Anthony Scott Cossu, Carlos Gonzalez, Rudy Guerrero, [Defendant Five], [Defendant Six], Warren Miller, and Oscar Alberto Palacios Espericuete conspired with each other and with other persons known and unknown, to launder money involved in the proceeds of drug trafficking in violation of 18 U.S.C. § 1956(a).[1]  To convict the defendant of conspiring to launder money, the United States was required to prove that two or more persons conspired, or agreed, to commit the crime of money laundering and that the defendant knowingly and voluntarily joined the conspiracy.  *United States v. Garcia*, 259 F. App'x 747, 750 (6th Cir. 2008).

The United States introduced ample evidence at trial to support the jury's verdict.  DEA Special Agent Troey Stout testified that the investigation began when a confidential source introduced him to Defendant One, an international money broker located in Mexico.  Defendant One worked with drug trafficking organizations ("DTOs") that imported controlled substances into the United States and needed the proceeds laundered and returned to the DTOs in Mexico.  Stout, posing as an international money launderer, received offers from Defendant One to facilitate money laundering transactions in various cities within the United States.  Upon accepting an offer from Defendant One, Stout would contact a DEA officer in the corresponding city, which would have an undercover agent act as Stout's "client."

---

[1] Some defendants have not been arrested and their identities remain under seal.

Stout, who was based in Lexington, Kentucky, communicated with Defendant One through a text-messaging app called "WhatsApp". On May 4, 2020, Stout received a contract from Defendant One to launder $150,000 in Chicago. Stout provided Defendant One with a telephone number and the serial number from a one-dollar bill, otherwise known as a "bill code" "token," or "receipt." The telephone number would be used for Defendant One's agent to communicate with Stout's "client" to arrange the money drop. Stout explained that the serial number would be verified by Defendant One's agent at the time of the money drop to ensure that the correct person was picking up the cash. Following the money drop, DEA officers would deposit the cash into an undercover DEA bank account. Stout would then typically purchase bitcoin with the funds and transfer it to a crypto wallet at the direction of Defendant One.

Thomas Asselborn is a special agent with the DEA's Chicago field division. Around May 4, 2020, Stout contacted Asselborn and advised him that he had received a contract to pick up money in Chicago and requested an undercover telephone number and the serial number from a dollar bill, which Stout then provided to Defendant One. Asselborn enlisted DEA Task Force Office Gus Corona, an undercover agent who spoke both Spanish and English, to act as Stout's "client."

During multiple calls on May 5, 2020, an unknown male ("UM") using a Mexican telephone number advised Corona that the money drop off would occur the following day. The UM provided Corona the bill code and advised that the amount of money to be picked up was $150,000. Then, on May 6, the UM called Corona and identified the location for the pickup—a Five Guys restaurant adjacent to a Lamborghini dealership in Downers Grove,

Illinois, where the defendant was employed.  The UM stated, "there will be a parking lot for Lamborghinis.  The young man will be there."

      Guerrero emerged from the Lamborghini dealership and approached Corona's vehicle upon his arrival.  After verifying the dollar bill number, Guerrero asked Corona to move his truck to a side street.  Once Guerrero and Corona both had moved their vehicles to that location, Guerrero entered his black Range Rover and retrieved a gray backpack.  He walked to Corona's vehicle and delivered the backpack which contained approximately $150,000 in United States currency.  The cash had been wrapped in rubber bands and placed in four individual packages that were plastic heat sealed.

      Corona had a second meeting with Guerrero on May 8, 2020.  The same UM reached out to Corona, but called from a different Mexican phone number.  The UM provided a bill code for the transaction and again advised that the amount to be picked up was $150,000.  On the morning of May 8, the UM sent Corona a text message advising him that the pickup location would be the same as prior transaction.  The UM told Corona that it would be "the same young man" who delivered the cash on May 6, 2020.

      Once Corona arrived at the car dealership, he spoke with the UM again, who appeared to call another individual and state that "Pablo" was already at the pickup location.[2]  Shortly thereafter, Guerrero arrived and asked Corona if he had the dollar bill.  Corona provided it to him, and the two then moved to the side street.  Guerrero took a white bag from his Range

---

[2]    TFO Corona went by the name "Pablo" during these transactions.

- 4 -

Rover and placed it in Corona's truck. Again, the bag contained approximately $150,000 which was wrapped in rubber bands and heat sealed.[3]

A third meeting between Corona and Guerrero occurred on May 12, 2020. The same UM advised Corona that "the young man" had the day off work, so the money drop took place about ten minutes away from Guerrero's residence. Guerrero arrived in his Range Rover and asked Corona for the bill code.[4] After verifying it, Guerrero gave Corona a blue Adidas bag which held a cardboard box containing $150,000 in cash, wrapped in rubber bands and heat sealed.

### A.

Regarding the offense's first element, the United States was required to prove the existence of a conspiracy to launder money. The government easily satisfied that burden. It is well-established that a formal agreement is not required and a tacit agreement or mutual understanding is sufficient to form a conspiracy. *United States v. Cordero*, 973 F.3d 603, 617 (6th Cir. 2020). Further, a conspiracy may be "inferred from circumstantial evidence that can reasonably be interpreted as participation in a common plan." *United States v. Ledezma*, 26 F.3d 636, 640 (6th Cir. 1994).

Agent Stout testified extensively regarding his communications with Defendant One during which Defendant One discussed his scheme to launder proceeds from DTOs. In addition to Stout's testimony, the United States introduced various Whatsapp messages

---

[3] Law enforcement video recorded the May 6 and May 8 transactions *via* aerial surveillance. The video footage was admitted as evidence and played for the jury during trial.

[4] An audio recording of this incident was introduced into evidence during which the defendant could be heard asking for "the receipt."

between Stout and Defendant One evincing Defendant One's plans to launder funds in particular cities, using bill codes, anonymous telephone numbers, and QR codes to facilitate the transactions.

While Agent Stout's participation cannot supply the necessary "agreement" to form a conspiracy, the government presented substantial evidence showing that others in the chain agreed to participate in the money laundering scheme. *See Cordero*, 973 F.3d at 617. Notably, the same UM coordinated money drops with Guerrero on three occasions. There was clear evidence showing that these money drops were part of Defendant One's scheme, as the telephone numbers and bill codes that were utilized originated from Defendant One's "contracts" with Agent Stout. Further, Stout ultimately returned the laundered funds to crypto wallets at Defendant One's direction.

Next, the government was required to prove was that Guerrero knowingly and voluntarily joined the conspiracy. The jury was properly instructed that the defendant had to know the conspiracy's main purpose and voluntarily joined, intending to help advance or achieve its goals. *See United States v. Sutherlin*, 118 F. App'x 911, 913-14 (6th Cir. 2004) (citing *United States v. Christian*, 786 F.2d 203, 211 (6th Cir. 1986)). Contrary to the defendant's suggestion, he did not have to participate in all aspects of the conspiracy or know all other conspirators. *United States v. Rugiero*, 20 F.3d 1387, 1391 (6th Cir. 1994) (observing that each member of a conspiracy need not know or have a direct association with all other members).

Agent Stout testified that the use of anonymous telephone numbers and bill codes is a common practice in money laundering. And TFO Corona testified that the presence of cash that is wrapped in rubber bands and heat sealed is indicative of drug proceeds. Based on this

testimony, the jury reasonably could impute knowledge of money laundering and drug trafficking activity to the defendant. The defendant suggested at trial through cross-examination that he was not aware of the contents of the bags he delivered. However, the jury was entitled to believe TFO Corona's testimony that Guerrero confirmed that he was delivering $150,000 during each money drop.

The government presented substantial evidence demonstrating that Guerrero knew he was working with others to achieve the goal of money laundering. TFO Corona's telephone calls with the UM indicated that the UM was simultaneously communicating with Guerrero during the money drops. Additionally, Guerrero obviously received the bill code and meeting instructions from the UM, who was an unindicted co-conspirator. Finally, on three occasions, Guerrero voluntarily transferred $150,000 in cash, which had trappings of the drug trade, to an individual he believed to be another co-conspirator.

The defendant contends that "handing someone $150,000 is not a crime." And while that is true, surreptitiously transferring large sums of cash in heat-sealed packaging to a complete stranger is highly suspicious. The jury was entitled to infer criminal intent and knowledge that the funds were derived from criminal activity based on evidence of these acts.

Based on the foregoing, there was sufficient evidence for a reasonable juror to convict the defendant of conspiring to commit the crime of money laundering.

**B.**

Guerrero also argues that he is entitled to a judgment of acquittal because he was not convicted of the conspiracy charged in the indictment, but of some other conspiracy. He elaborates that "no rational trier of fact could have concluded that [he] conspired with members other than Defendant One." The defendant advanced this argument during trial and the jury

was instructed in accordance with Sixth Circuit pattern instructions 3.08 and 3.09, which explain multiple conspiracies and how their existence can constitute a material variance from the indictment. However, the jury obviously rejected this theory and concluded that the defendant was part of the charged conspiracy.

To succeed on this claim, Guerrero must show that a variance occurred and that he was prejudiced by it. *United States v. Caver*, 470 F.3d 220, 235 (6th Cir. 2006). A variance occurs in the conspiracy context when "an indictment alleges one conspiracy, but the evidence can reasonably be construed only as supporting a finding of multiple conspiracies." *United States v. Warner*, 690 F.2d 545, 548 (6th Cir. 1982). In considering the defendant's Rule 29 motion, the court construes the evidence in the light most favorable to the United States and assesses whether the defendant "had knowledge of and agreed to participate in a single, overarching conspiracy." *United States v. Lara*, 679 F. App'x 392, 394 (6th Cir. 2017) (quoting *United States v. Smith*, 320 F.3d 647, 652 (6th Cir. 2003)).

The court considers three factors in determining whether a single conspiracy exists: the overlapping of the participants in various dealings; the nature of the scheme; and the existence of a common goal. *Id.* "[A] single conspiracy does not become multiple conspiracies simply because each member of the conspiracy d[oes] not know every other member." *United States v. Williams*, 998 F.3d 716, 730 (6th Cir. 2021). Instead, each member must have agreed to participate in "what he knew to be a collective venture directed toward a common goal." *Id.* The government presented sufficient evidence for a rational juror to conclude that Guerrero conspired with other defendants to achieve the overall goal of laundering drug proceeds.

Agent Stout testified that, in April and August of 2021, Defendant Warren Miller dropped off large amounts of cash to an undercover agent in Lexington, Kentucky on two

occasions pursuant to Stout's contract with Defendant One.  Then, in June 2021, Defendant Oscar Espericuete delivered a large sum of cash to an undercover officer in Lexington pursuant another contract with Defendant One.  These money drops were facilitated and carried out in the same manner as the May 2020 money drops involving Guerrero.  Based on these transactions and the three transactions involving Guerrero himself, the jury reasonably could have concluded that Guerrero was involved in a single conspiracy in which Defendant One was the leader or "hub" of the money laundering organization.[5]

Regardless, Guerrero is not entitled to relief unless he can show that he was prejudiced by the purported variance.  When considering prejudice, the Court asks whether the defendant was unable to present his case and was taken by surprise by the evidence offered at trial or whether the defendant was convicted for substantive offenses committed by another.  *United States v. Swafford*, 512 F.3d 833, 842-43 (6th Cir. 2008).  Guerrero has not responded to this argument or otherwise indicated that he was unable to present his case or was taken by surprise by any evidence offered by the government.  The Court cannot imagine how this would be the case, since Guerrero was the only defendant to proceed to trial and little evidence was offered regarding the substantive crimes of other co-conspirators.  *See id.* (citing *United States v. Bertolotti*, 529 F.2d 149, 156 (2d Cir. 1975)) (observing that "prejudice may exist where spillover occurs because of a large number of improperly joined defendants").  Accordingly,

---

[5] The government also presented evidence that the UM was involved in dealings with multiple individuals within the conspiracy.  TFO Corona testified that on May 3, 2020, he spoke with the UM to coordinate a money pickup for $150,000 based on a contract from Defendant One.  The UM advised Corona that "another guy is going to be calling you."  Another unknown male called Corona to coordinate the money drop, which occurred on May 4, 2020.

the defendant is not entitled to a judgment of acquittal based on a variance or the existence of multiple conspiracies.

## C.

A prosecution for conspiracy to commit money laundering may be brought in any district in which an act in furtherance of the conspiracy took place. *United States v. Logan*, 542 F. App'x 484, 492 (6th Cir. 2013) (citing 18 U.S.C. § 1956(i)(2)). The jury is only required to find this fact by a preponderance of the evidence. *United States v. Petlechkov*, 922 F.3d 762, 769 (6th Cir. 2019). The defendant contends that he is entitled to a judgment of acquittal or a new trial because there was insufficient evidence for venue to lie in the Eastern District of Kentucky.

As noted previously, Agent Stout testified regarding contracts he made with Defendant One, which led to money drops by Defendants Miller and Espericuete in the Eastern District of Kentucky. Further, Stout was located in Lexington during his communications with Defendant One. Defendant One's incoming communications during which he negotiated money laundering contracts and gave instructions for the return of drug trafficking proceeds constitute acts in furtherance of the conspiracy that occurred within this district. *See United States v. Rommy*, 506 F.3d 108, 120 (2d Cir. 2007) (citing *United States v. Naranjo*, 14 F.3d 145, 146 (2d Cir. 1994)). There was sufficient evidence for the jury to conclude that venue was proper.

**II.     The defendant is not entitled to a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.**

Rule 33 of the Federal Rules of Criminal Procedure provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of

justice so requires." Fed. R. Crim. P. 33(a). "[I]t is widely agreed that Rule 33's 'interest of justice' standard allows the grant of a new trial where substantial legal error has occurred." *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010).

## A.

The defendant requested that the jury be given an instruction explaining "hub and spoke" conspiracies. However, the Court declined to give the defendant's proposed instruction, citing the commentary to Sixth Circuit pattern instruction 3.09, which indicates that such instructions are not favored within this circuit. The defendant did not object or make further argument regarding this issue.

During closing argument, defense counsel stated:

If you imagine a bicycle wheel where you have a hub and spokes. In order for that wheel to work, you got to have a rim. We call it a hub and spoke conspiracy. The rim is the common objective for the wheel to spin. The hub is where everything gets connected.

There is a concept in the law that is called a rimless hub and wheel—hub and spoke. And when it's a rimless hub and spoke, then that is multiple conspiracies that we have here. Because if the government says that the hub is Defendant One, he is the only one that hops from one spoke to the next with no real common goal between the spokes.

When there is no rim or a common goal connecting the spokes into a single scheme, the single hub and spoke conspiracy becomes multiple conspiracies between the individual spokes and the hub.

At that point, the United States objected and requested a sidebar. Counsel for the government asked for the "source" of defense counsel's argument and stated that "[i]t seemed to be intended to appear that he was reading from jury instructions." Defense counsel responded that he was reading direct quotes from the United States Supreme Court that he had

written down. The Court sustained the objection and defense counsel resumed his closing argument.

Counsel complains that he should have been permitted to complete his argument as desired, as it was a correct statement of the law based on *Kotteakos v. United States*, 328 U.S. 750 (1946). However, the trial court has broad discretion to limit arguments that tend to confuse the jury. *Richardson v. Bowersox*, 188 F.3d 973, 980 (8th Cir. 1999). At the time of the government's objection, defense counsel was no longer arguing his case pursuant to the instructions given by the Court, but essentially was reading additional instructions that he had drafted.

Regardless, the defendant does not explain how he was prejudiced by the Court's ruling on the government's objection. Following the sidebar, defense counsel resumed his closing as follows:

> What you have here, ladies and gentlemen, is separate defendants entering into separate agreements with no connection to each other, with no knowledge of each other. None of the spokes—and you heard Agent Stout tell you—the clients, it's kind of like a broker, Defendant 1, client privilege. They don't discuss each other, they don't talk about each other, they don't know who is who, and they don't know that he works for the other organization. There's no way that Mr. Guerrero's, the organization that the money was sent, had knowledge of the organization that Mr. Oscar or Mr. Miller here in Kentucky knew of each other. There was nothing connecting them. Defendant 1 was simply jumping from spoke to spoke independently. Imagine an accountant and Client 1 comes into the accountant and says, I want you to help me hide some money in a foreign country, and the accountant says, okay, I'll do that. Client 2 comes to the accountant and says, I want to hide some money in a foreign country, the accountant says okay. Client 3 comes in and says the exact same thing, and accountant says okay. Does that create an overall arching conspiracy by all of the clients? They don't know of each other. They don't even know that they went into the same accountant. There's no one overarching goal to send money to a foreign country when we don't know where the foreign country is, or even if it was all in the Cayman Islands, so what. That doesn't make the connect.

The remainder of the defendant's closing also was devoted to the argument that there were several smaller conspiracies as opposed to one overarching conspiracy. Counsel does not identify any substantive argument that the Court's ruling prevented him from making.

The defendant contends that this issue was compounded when the Court overruled his objection to the government's statement during closing that defense counsel had made a statement that was "not factually or legally correct." Specifically, during his closing argument, defense counsel stated: "And again, please, let's not be confused again, there was no two separate organizations for money laundering and for drug dealing. There might be two different charges, but it's one organization." [Record No. 124, pp. 41-42] The attorney for the United States stated during rebuttal: "And defense counsel has, I believe erroneously claimed that DTOs and MLOs are all the same, they're all part of one organization. That's not correct. It's not factually or legally correct." *Id.* p. 49. The Court overruled the defendant's objection to the government's comment.

Guerrero now contends that the overruling of his objection permitted the government to provide the jury with an incorrect statement of the law. However, it is not an incorrect statement of the law to say that drug trafficking organizations and money laundering organizations are distinct. Further, defense counsel had previously stated in closing:

> I think that there was a little confusion here. Because what the government really told you is that when they charge people, they charge you differently when you deal with the money and when you deal with the drugs. So there's money laundering conspiracies as a criminal charge, and there's drug possession and distribution conspiracies as a separate charge. However, the same person can be charged with both, like Carlos Gonzalez. So the organization is really one organization. . . . Now organizations, like any business organization, have different levels and different sections . . . but they all work for the same organization.

The government objected to that statement on the basis that Gonzalez was not charged with a drug conspiracy and the objection was sustained. The Court's ruling on the government's objections helped clarify that, as a matter of law, DTOs and MLOs are not one in the same, but the defendant was not precluded from advancing his argument that, in this particular case, the DTO and MLO was part of the same organization.

Guerrero also contends that the Court's ruling on the government's objection "signaled to the jury that the government had the law on its side and [Guerrero] did not." However, the objection to the defendant's reading of the spoke-and-wheel jury instruction, like most objections raised during trial, was discussed and resolved at the bench. The jury likely was unaware of the Court's ruling since there was no detectable disruption in the flow of counsel's closing and he continued with the same line of argument for the remainder of his allotted time. The defendant does not cite any authority indicating that these rulings would entitle him to a new trial and Court cannot identify any basis for relief.

## B.

Guerrero argues that he is entitled to a new trial because the Court failed to issue a separate verdict form with respect to venue. This argument fails for several reasons. As an initial matter, the Court notes that the defendant did not request a separate verdict form regarding venue and thus raises this issue for the first time. Further, the defendant does not dispute that the jury was properly instructed with respect to venue. Finally, the defendant has not identified any authority indicating that a separate verdict form is required for the issue of venue. *Cf. United States v. Ghanem*, 993 F.3d 1113, 1131 (9th Cir. 2021) (observing that, in cases with "similarly muddled postures," trial courts might *consider* using special verdict forms requiring venue findings separate from findings on substantive guilt).

**C.**

Finally, Guerrero contends that the jury's verdict was against the manifest weight of the evidence. In deciding a Rule 33 motion based on this argument, the Court "may sit as a thirteenth juror and consider the evidence to ensure that there is no miscarriage of justice." *United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988). However, the court only orders a new trial if the evidence weighs "heavily against the verdict." *United States v. Burks*, 974 F.3d 622, 625 (6th Cir. 2020). A jury's verdict is not unreasonable simply because it could have been different or other results seem more reasonable. *Id.*

Guerrero incorporates by reference his Rule 29 motion as the basis for his request for relief under the "interest of justice" standard. The Court likewise incorporates its preceding discussion of its reasons for finding the jury's verdict reasonable and supported by the evidence. No miscarriage of justice has occurred.

**III.**

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** as follows:

1. The defendant's motion for a judgment of acquittal [Record No. 125] is **DENIED**.

2. The defendant's motion for a new trial [Record No. 126] is **DENIED**.

Dated: August 4, 2022.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky